## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| IN RE: | GEM REFRIGERATOR CO., | : | Chapter 7 |
| | | : | |
| | Debtor. | : | Bky. No. 12-14902 ELF |
| | | : | |
| GARY F. SEITZ, Chapter 7 Trustee, | | : | |
| | | : | |
| | Plaintiff, | : | |
| | | : | |
| | v. | : | |
| | | : | Adv. No.  13-0199 |
| REPUBLIC FIRST BANK, | | : | |
| | | : | |
| | Defendant, | : | |
| | | : | |
| REPUBLIC FIRST BANK, | | : | |
| | | : | |
| | Third Party Plaintiff, | : | |
| | | : | |
| | v. | : | |
| | | : | |
| UNITED CAPITAL PRIVATE WEALTH COUNSELING, | | : | |
| | | : | |
| JEFFREY S. STEINBERG, | | : | |
| | | : | |
| | Third Party Defendants. | : | |

# O P I N I O N

## I.  INTRODUCTION

In this adversary proceeding, the chapter 7 trustee, Gary Seitz ("the Trustee"), seeks to

avoid a pre-petition lien held by Defendant Republic First Bank ("the Bank") in three (3)

investment accounts of the debtor, GEM Refrigerator Co. ("the Debtor").  The accounts are held

1

at Charles Schwab & Co., Inc. t/a Charles Schwab Institutional ("Schwab"), and have a combined value of approximately $1 million.

The Trustee asserts that the Bank's security interest was unperfected as of the commencement of the case and requests that its lien be avoided under 11 U.S.C. §544(a) (and related declaratory relief).[1]  The Bank counters that its lien remained perfected at all times and is not avoidable under the Bankruptcy Code.

The Bank has filed a motion for partial summary judgment ("the Motion").  For the reasons that follow, I will grant the Motion and enter judgment in the Bank's favor on the Trustee's lien avoidance and declaratory relief claims.[2]

## II.  PROCEDURAL HISTORY

On May 21, 2012, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The case was converted to a case under chapter 7 on August 29, 2012.  That same day, the United States Trustee appointed Gary F. Seitz, as the chapter 7 trustee of the Debtor's bankruptcy estate and he continues to serve in that capacity.

On April 10, 2013, the Trustee commenced this adversary proceeding by filing a

---

[1]      Section 544(a)(1) gives the trustee the avoidance rights of a hypothetical creditor who obtained a judicial lien on the debtor's property as of the commencement of the case.  Those rights are governed by applicable nonbankruptcy law, usually state law.  5 Collier on Bankruptcy ¶544.02[1] (Alan N. Resnick, Henry J. Sommer eds., 16th ed. 2012).  In this case, both parties have assumed that if the Bank's lien was not perfected, applicable nonbankruptcy law would allow a judgment creditor (and therefore, the Trustee) to avoid the Bank's lien.

[2]      In the Amended Complaint, the Trustee also asserts claims for equitable subordination and marshaling.  Those claims are not at issue in the Motion.

Complaint.[3]  On May 16, 2013, the Trustee filed an Amended Complaint asserting five (5)

counts, including inter alia, declaratory relief, lien avoidance, subordination, and marshaling.

(Doc. #10).  The Bank filed an Answer on May 30, 2013.  (Doc. #12).[4]  The Bank's Answer

included counter claims requesting a declaration that:

- its lien is perfected;

- it is the lawful owner of the securities held in the Schwab accounts;

- the Trustee must cease and desist from disputing and interfering with the Bank's right of ownership; and

- the Trustee must instruct the custodian of the securities to release them to the Bank.[5]

---

[3]     Earlier, on March 28, 2013, the Bank moved for leave to commence an action in state court against the Trustee, seeking a declaratory judgment that the Bank has a perfected, first position security interest in the Schwab accounts.  (Bky No. 12-14902, Doc. #215).  I denied the motion because, as of the date of the hearing on the motion, the Trustee had already commenced this adversary proceeding, in which he asserted all of the same issues that the Bank sought leave to raise in state court. (Id., Doc. # 233).


[4]     On June 5, 2013, the Bank also filed a Third-Party Complaint against two (2) third-party defendants – Jeffery S. Steinberg, the President and CEO of the Debtor, and United Capital Private Wealth Counseling.  (Doc. #13).  The Bank filed an Amended Third-Party Complaint on July 9, 2013. (Doc. #23).  Based on principles of promissory estoppel and negligent misrepresentation, the Bank asserted that the third-party defendants are liable to the Bank, for any losses the Bank would suffer if the bankruptcy court determined that the pre-petition lien on the Schwab accounts were unperfected and avoidable.

On July 11, 2013, I raised sua sponte the issue whether the bankruptcy court has jurisdiction over the Bank's third-party claims.  At the parties' suggestion, I deferred a decision on that question pending the outcome of the Bank's summary judgment motion.  In light of the entry of summary judgment in the Bank's favor, the third party claims are moot.


[5]     Given my disposition of the Motion, it is unclear whether the counterclaims continue to raise any controversy.  Accordingly, I will schedule a hearing to inquire whether the Bank seeks any further relief.

3

Id. The Trustee answered the counterclaims on June 20, 2013. (Doc. #20).

On September 4, 2013, the Bank filed the instant Motion. (Doc. #44). Briefing was completed on December 6, 2013.[6] The matter is now ready for disposition.

### III.  STATEMENT OF UNDISPUTED FACTS

The Debtor is a Delaware Corporation. (See Financing Statements (Exs. Bank-9, 10); Credit Note (Ex. Bank-11); Loan Agreement (Ex. Bank-12)).

On April 21, 2011, the Debtor entered into several transactions. First, Jeffrey Steinberg, as President and C.E.O. of the Debtor, executed a Revolving Credit Note, pursuant to which the Bank agreed to lend the Debtor the maximum aggregate principal sum of $1,600,000.00. (Ex. Bank-11).

Second, as security for the Credit Note and on behalf of the Debtor, Steinberg executed a Loan and Security Agreement ("the Loan Agreement"), pursuant to which the Debtor granted the Bank a blanket lien on all of its assets. (Ex. Bank-12 at ¶3.1a.). More specifically, the Loan Agreement defined the loan "collateral" as "personal property," including "all assets" of the Debtor, "whether now owned or hereafter acquired," including inter alia, all "accounts," all "investment property" and "[a]ll items detailed in the UCC Financing Statement filed in connection" with the transaction. (Id. at ¶3.1.a.i., xiii., vii.). Also included in the definition of

---

[6] The Trustee initially opposed the Motion based on the lack of authenticity and reliability of the evidentiary matter the Bank had offered in support of the Motion. Specifically, the Trustee argued that the Bank's allegations that the relevant documents were not reasonably subject to dispute was not supported by admissible evidence as required by Fed. R. Civ. P. 56(c)(2). Accordingly, the Trustee requested additional time to conduct discovery. I granted that request and issued an order on September 19, 2013 deferring a ruling on the Motion pending further discovery. (Doc. #48). The parties conducted that discovery and supplemental briefs were filed thereafter. (See Doc. #'s 54-56).

collateral were "[t]he Marketable Securities," (id. at ¶3.1.a.xviii.), which were defined as "the

marketable securities . . . [at] an account manager acceptable to the Lender including Securities

Account #[ ] -8321 established and maintained at [Schwab]."  (Id. at ¶1.1).

      Third, the Debtor entered into a Securities Account Pledge Agreement with the Bank

("the Pledge") in connection with the Loan Agreement.  (Ex. Bank-13).  The Pledge, which

identified "Securities Account # - 8321," (hereafter, "the Parent Account"), provided that as

security for its obligations under the Loan Agreement, the Debtor

> pledges, transfers and assigns [Republic First Bank], *a continuing Lien on*, and
> security interest in . . . Securities Account #   -8321 established and maintained
> with Charles Schwab & Co., Inc. t/a Charles Schwab Institutional, and in all
> assets (including without limitation, *all Investment Property, Financial Assets
> and all Security Entitlements* with respect thereto) contained therein together
> with all additional, replacements and substitutions thereto *and all resulting
> interests, distributions, dividends and proceeds thereof*  (collectively,
> "Collateral").

(Id.) (emphasis added).

      The Pledge further provided that

> [s]o long as no Event of Default has occurred and is continuing under the Loan
> Agreement, and until Secured Party delivers a Notice of Exclusive Control,
> Pledgor shall retain the sole right to vote the Collateral and exercise all rights of
> ownership with respect to all questions for purposes not inconsistent with the
> terms hereof.

(Id.).

      Fourth and, finally, the Debtor, the Bank and Schwab entered into a Managed Pledged

Asset Account Agreement ("the Control Agreement"), which also identified the Parent Account

and provided in relevant part:

> Pursuant to the terms of the Pledge Agreement, *Borrower has granted to Lender
> a security interest in the rights and property interest of certain assets of
> Borrower, including, without limitation, all of Borrower's rights, title and*

5

> *interest in the [Parent] Account and all Borrower's security entitlements with respect thereto*, together with all investments, funds, securities, instruments and other property therein and all profits, interest, dividends, income, distributions, and cash and non-cash proceeds thereof ("the Collateral").  The Account is not a margin account or subject to check writing privileges.  The title of the Account shall be "[Name of Borrower]; Pledged Asset Account."

(Ex. Bank-14) (emphasis added).

On April 22, 2011, Steinberg and Bruce Gruhler, also an officer of the Debtor, signed an

Organization Account Agreement to open a new account at Schwab through its investment

advisor United Capital Financial Advisers ("United Capital").  (Ex. Trustee-1).  A few days later,

on April 26, 2011, the Bank filed a Financing Statement with the Delaware Department of State.

(Exs. Bank-9, 10).[7]  The Financing Statement identified the Bank's collateral as including

"deposit accounts, investment property . . . whether now existing or hereafter arising, whether

now owned or hereafter acquired or whether now or hereafter subject to any rights in the

foregoing property."  (Id. at ¶1).[8]

As of June 10, 2011, the Parent Account, a Money Market Fund account, had a value of

$1,004,833.75.  (Ex. Bank-27).  Prior to that date, the Parent Account consisted of shares of

---

[7]      The Bank actually filed two (2) financing statements on that date.  The Bank explained in its brief that the collateral schedules were inadvertently switched.  Ex. Bank-9 represents the Financing Statement for the $1.6 million loan at issue, but includes the schedule for the Bank's simultaneous $2.1 million loan to the Debtor, which is represented at Ex. Bank-10.  The Bank points out that the two (2) collateral schedules are nearly identical with respect to the collateral covered under each loan.  "The major difference between the two schedules is that the schedule for the $2.1 million dollar loan contains language related to Small Business Administration loans, which is not applicable or necessary for the collateral schedule for the $1.6 million dollar line of credit."  (Bank Supp. Memo at 2).  The Bank argues that the schedule is not misleading because they both provide a blanket lien on all of the Debtor's property.  The Trustee does not suggest otherwise.

[8]      The Financing Statement also states that the collateral includes "[a]ll of the foregoing whether now owned or hereafter acquired, together with the products and proceeds thereof, including but not limited to insurance proceeds."  (Exs. Bank-9 & 10, at ¶6).

$1,004,833.75.  (Ex. Bank-27).  Prior to that date, the Parent Account consisted of shares of stock in various companies.

On or about June 16, 2011, Erik Evans, a "Wealth Advisor" with United Capital, sent an e-mail to James D'Antonio, a Vice President of the Bank, with a carbon copy sent to Steinberg ("the June 16th E-mail").  (Ex. Bank-15).  In the June 16th E-mail, Evans requested Mr. D'Antonio's written permission to effect transfers from the Parent Account into three (3) separate "sub-accounts," to implement the Debtor's investment strategy.  D'Antonio acquiesced to the request and sent written instructions on the Bank's letterhead to Schwab ("the June 16th Letter") to transfer and invest funds from the Parent Account as follows:

1. $402,262.52 into Account "7344," and invest in the Endowment Mutual Fund 20/80;

2. $402,260.52 into Account "4162," and invest in Tactical Fixed Income;

3. $201,130.26 into Account "4438," and invest in Sage Advisory Multi Asset Income.[3]

(Ex. Bank-16).

I will follow the parties' convention of referring to Accounts Nos. 7344, 4162 and 4438 as "the Sub-Accounts."

---

[3]      According to the June 30, 2011 account statement for the Parent Account, $1,519.87 in the form of "cash" remained in the account after the transfers.  (Ex. Bank-27).

7

incorporated into bankruptcy adversary proceedings by Fed. R. Bankr. P. 7056, is well

established.  Summary judgment is appropriate only when, drawing all reasonable inferences in

favor of the nonmoving party, there is no genuine issue as to any material fact and the moving

party is entitled to judgment as a matter of law.  E.g., Tri–M Group, LLC v. Sharp, 638 F.3d 406,

415 (3d Cir. 2011); In re Bath, 442 B.R. 377, 387 (Bankr. E.D. Pa. 2010).  In other words,

summary judgment may be entered if there are no disputed issues of material fact and the

undisputed facts would require a directed verdict in favor of the movant.  See Fitzpatrick v. City

of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

    In evaluating a motion for summary judgment, the court's role is not to weigh the

evidence, but to determine whether there is a disputed, material fact for resolution at trial.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A genuine issue of material fact is

one in which sufficient evidence exists that would permit a reasonable fact finder to return a

verdict for the non-moving party.  Id. at 248.  The court must view the underlying facts and make

all reasonable inferences therefrom in the light most favorable to the party opposing the motion.

Montone v. City of Jersey City, 709 F.3d 181, 189 (3d Cir. 2013).  On the other hand, if it

appears that the evidence "is so one-sided that one party must prevail as a matter of law," the

court should enter judgment in that party's favor.  Anderson, 477 U.S. at 252.

    As a threshold matter, the moving party's initial burden is to demonstrate that there are

no disputed issues of material fact.  E.g., U.S. v. Donovan, 661 F.3d 174, 185 (3d Cir. 2011);

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996).  How the movant

meets this burden and how the respondent may rebut the movant's showing is affected by the

allocation of the evidentiary burden of persuasion if the dispute were to proceed to trial.

8

Here, the Bank (the moving party) does not have the burden of proof at trial.  Therefore, it may establish the absence of a disputed issue of material fact and grounds for summary judgment one (1) of two (2) ways:  First, and most simply, if the Bank presents evidence establishing that the undisputed facts negate at least one (1) element of the Trustee's claim, it is entitled to summary judgment.  See Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co., 868 F. Supp. 1278, 1287 n.5 (D. Utah 1994).  Alternatively, the Bank may obtain summary judgment by demonstrating that the Trustee lacks evidence to support an essential element of its claim.  See, e.g., Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996); In re Polichuk, 506 B.R. 405, 421-22 (Bankr. E.D. Pa. 2014).

## V. DISCUSSION

### A.  Overview

In this case, there are no genuine issues of fact.  The evidence is undisputed as to what occurred  –  the Bank took certain actions to acquire and perfect a lien on the Debtor's assets, including the Schwab Parent Account and, subsequently, permitted the Debtor to transfer most of the assets from the Parent Account to the three (3) Schwab Sub-Accounts.

In seeking summary judgment, the Bank invokes the first "path" to judgment described above.  It claims that the undisputed facts demonstrate that its lien on both the initial account and the three (3) subsequent accounts all were perfected, thereby negating an essential element of the Trustee's avoidance claim.  See n.1, supra.  The Trustee does not dispute that the Bank's lien on the Parent Account (and the property contained therein) was perfected.  Ultimately, the Trustee contends that the transfers of the property from the Parent Account to the three (3) Sub-Accounts

"undid" the prior perfection.

Resolution of th3 "perfection" issue turns, in large part, on the characterization of the secured property under the Uniform Commercial Code ("UCC"). For the reasons outlined below, I conclude that the Sub-Accounts constituted "investment property" under the UCC and, as such, the Bank's lien remained perfected following the transfer of property from the Parent Account to the Sub-Accounts.  Therefore, the Bank is entitled to summary judgment.

### B.  Characterization of the Property that Serves as the Bank's Collateral: the Parties' Contentions

The assets in the Sub-Accounts derived from the Parent Account, so it is logical to start by examining the status of the original, Parent Account, particularly because the parties dispute the characterization of the Parent Account under the UCC.

In a nutshell, the Trustee argues the Parent Account was a "deposit account," while the Bank contends it was "investment property."  The proper characterization is significant because it affects the means by which a secured party's lien can be perfected.

The Trustee's position is that, as a deposit account, the Bank's lien on the Parent Account was perfected by execution of the Control Agreement.  The Trustee then reasons that when the property in the Parent Account was transferred from the Parent Account to the Sub-Accounts, the perfection of the Bank's lien lapsed because the Bank neither amended the Control Agreement to encompass the three (3) Sub-Accounts nor obtained new control agreements for the Sub-Accounts.  (See Trustee's Supp. Memo at 8-9 (unpaginated)).  The Trustee also suggests that the composition of the assets contained in the Sub-Accounts, which includes "Cash and Other Assets (i.e., other than the other categories specifically listed such as equities, equity

funds, mutual funds, bonds and bond funds), are not characteristic of "investment property," and, therefore, the Sub-Accounts must be "deposit accounts."

The Bank contends that, not only was the Parent Account "investment property," but so too are the Sub-Accounts and that the Financing Statement which perfected its lien on the Parent Account also served to perfect the Bank's lien on the Sub-Accounts.

To resolve the dispute, it is necessary to review the relevant definitions under the UCC. However, there is a threshold choice of law issue.

### C.  Choice of Law Governing the Characterization of the Collateral

The Trustee first raised a choice of law issue in his supplemental brief.  While the parties agree that the Uniform Commercial Code ("UCC") applies, they do not agree on which state's UCC is applicable.

The Bank argues that Pennsylvania law applies because the Debtor is headquartered in Philadelphia and all of the loan documents – the Credit Note (Ex. Bank-11 at 1), the Loan Agreement (Ex. Bank-12 at 39) and the Pledge Agreement (Ex. Bank-13 at 4) –  dictate that Pennsylvania law applies. The Trustee argues that the Delaware UCC applies because the Debtor is a Delaware corporation.[10]

For choice of law questions, I am required to apply the choice of law rules of the forum state.  In re Southwest Equipment Rental, Inc., 1992 WL 684872, at n.48 & accompanying text (E.D. Tenn. July 9, 1992) (collecting cases and discussing division of authority on the subject of choice of law rules in bankruptcy cases); In re Buffalo Molded Plastics, Inc., 354 B.R. 731, 750

---

[10]      I note that while the Trustee argues that the Delaware UCC applies, he does not explain why the application of the Delaware UCC would compel a different result from the application of the relevant Pennsylvania UCC provisions.

(Bankr. W.D. Pa. 2006) (citing Klaxon Co. v. Stentor Mfg. Co., 313 U.S. 487 (1941)); see

Perma-Liner Industries, Inc. v. U.S. Sewer & Drain, Inc., 630 F. Supp. 2d 516, 522 (E.D. Pa.

2008) (federal court, sitting in diversity or with supplemental jurisdiction over a common law

claim, must apply the choice of law rules of the forum state and Pennsylvania courts generally

enforce contractual choice of law provisions); see also In re Old Summit Mfg., LLC, 523 F.3d

134, 137 (3d Cir. 2008) (applying Pennsylvania law in applying the UCC to a contract that

provided that it shall be construed in accordance with Pennsylvania law). But see John T. Cross,

State Choice of Law Rules in Bankruptcy, 42 Okla. L. Rev. 531, 542-45 (Winter 1989).

Consequently, I will apply Pennsylvania law.

Pennsylvania courts generally will honor choice of law provisions in contracts, to the

extent they are reasonably related to the chosen forum. Gay v. CreditInform, 511 F.3d 369, 390

(3d Cir. 2007) (citing Churchill Corp. v. Third Century, Inc., 578 A.2d 532, 537 (Pa. Super. Ct.

1990)). Under the Pennsylvania UCC, in particular, "when a transaction bears a reasonable

relation to this Commonwealth and also to another state . . . the parties may agree that the law

either of this Commonwealth or of such other state . . . shall govern their rights and duties." 13

Pa. C.S. A. §1301.


Here, the Loan Agreement provides that Pennsylvania law applies.[11]  Because I conclude

---

[11]    Paragraph 1.1 defines the UCC as the Uniform Commercial Code as adopted in the
Commonwealth of Pennsylvania and further states that any capitalized terms used without further
definition shall have the meaning set forth in the UCC.  (Ex. Bank-12 at ¶1.1).  Paragraph 3.3 defines the
collateral entirely in "capitalized terms," including "Deposit Accounts" and "Investment Property."  (Id.
at ¶3.3.a.ix, xiii.).  It is obvious from the plain language of the Loan Agreement that the Debtor and the
Bank intended that the Pennsylvania UCC govern the security arrangement, including the characterization
of the collateral under the UCC.

(continued...)

that the parties' agreement bears a reasonable relationship to Pennsylvania, I will respect the

parties' contractual choice of law provision. But see In re Eagle Enterprises, Inc., 237 B.R. 269,

273-74 (E.D. Pa. 1999).[12]

---

[11](...continued)

[12]      Eagle Enterprises suggests that the general principle stated above in the text, (i.e., that
federal courts, applying state law, will enforce reasonable choice of law agreements made by contracting
parties), does not apply to a bankruptcy trustee (or perhaps any creditor invoking a state law based
avoidance power).

          Eagle Enterprises involved a bankruptcy trustee's exercise of his avoidance power under
11 U.S.C. §544.  The issue was whether a debtor's purported lease of property from a lessor was a "true
lease" or an instalment sale subject to a security interest.  The trustee asserted that the purported lease
actually was a disguised instalment sale subject to a security agreement, that the debtor had an ownership
interest in the subject property and that the purported lessor's security interest in the property was
avoidable because it was unperfected.  See 223 B.R. 290, 292 (Bankr. E.D. Pa. 1998).   The parties'
contract provided that German law should apply and there was some evidence presented that German law
would treat the parties' agreement as a "true lease," whereas under the Pennsylvania UCC, the transaction
would be treated an instalment sale subject to a security agreement.  Both the bankruptcy court and the
district court held that the bankruptcy trustee, acting as the representative of all creditors with the power
of a judicial lien creditor under 11 U.S.C. §544 was not bound by the contractual choice of law provision
making German law applicable.  The court reasoned that the debtor and the contracting creditor could not
adversely affect the rights of third parties who were not parties to their contract.  See 237 B.R. at 273-74,
aff'g 223 B.R. at 293.

          Respectfully, in my view, while the outcome in Eagle Enterprises may have been correct
for other reasons, I disagree with courts' reasoning.

          A bankruptcy trustee's avoidance claim under §544 generally depends on whether the
parties have complied with the perfection requirements under state law.  I perceive no reason why the
determination of the choice of law regarding those perfection requirements in a commercial transaction
should not begin with the parties' contract itself and the application of ordinary principles of contract law
through which the parties' expressed intent controls.  Respecting the parties' choice of law agreement
impacts the rights of third parties (i.e., other creditors) no more than other pre-petition contractual
provisions between a debtor and a contracting creditor.  Indeed, in the bankruptcy context, third parties
are adversely affected by the very grant of the security interest in the debtor's property.  Yet, that
contractual provision remains enforceable against the bankruptcy estate (assuming the lien is perfected).
Why should choice of law provisions be treated differently, particularly when courts enforce the parties'
agreement on choice of law is enforced only when the transaction bears a reasonable relationship to the
jurisdiction chosen by the parties?  In my view, the legal principle that controls here is that property
interests are created and defined by state law and the corollary principle that, unless some federal interest
requires a different result, property interests should not be analyzed differently simply because an

                                                                                (continued...)

Therefore, I begin by reviewing the Pennsylvania UCC to determine the nature of the

secured property (collateral).


### D.  The Parent Account Is "Investment Property" under the Pennsylvania UCC

### 1.

Under the Pennsylvania UCC, a "deposit account" is a

> demand, time, savings, passbook or similar account maintained with a bank. The
> term does not include investment property or accounts evidenced by an
> instrument.

13 Pa. C.S.A. § 9102.

The Pennsylvania UCC defines "investment property" as a

> security whether certificated or uncertificated, security entitlement, ***securities
> account***, commodity contract or commodity account.

13 Pa. C.S.A. §9102 (emphasis added).

As explained in Comment 6 to §9102, the term investment property

> includes a "***securities account***" in order to facilitate transactions in which a
> debtor wishes to create a security interest in all of the investment positions held
> through a particular account rather than in particular positions carried in the
> account.

Id.  (emphasis added).

The terms deposit account and "investment property" are mutually exclusive.  This is so

for all types of investment property, including securities and security entitlements, or shares in a

money-market mutual fund, even if the shares are redeemable by check.  As specified in Cmt.

---

[12](...continued)
interested party is involved in a bankruptcy proceeding.  See Butner v. U.S., 440 U.S. 48, 55 (1979).

12, 13 Pa. C.S. § §9102.

The terms, "security,"[13] "security entitlement,"[14] "securities account" and related terms

are defined in Article 8 of the Pennsylvania UCC.  Most pertinent in this case is the definition of

---

[13]        Pursuant to section 8-102, a "security" is defined as follows:

"Security." Except as otherwise provided in section 8-103 (relating to rules for determining whether certain obligations and interests are securities or financial assets), an obligation of an issuer or a share, participation or other interest in an issuer or in property or an enterprise of an issuer:

(1) which is represented by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer;

(2) which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests or obligations; and

(3) which:

(i) is, or is of a type, dealt in or traded on securities exchanges or securities markets; or

(ii) is a medium for investment and by its terms expressly provides that it is a security governed by this division.

13 Pa. C.S.A. §8102.


[14]        A person acquires a "security entitlement" if a securities intermediary:

• indicates by book entry that a financial asset has been credited to the person's securities account;

• receives a financial asset from the person or acquires a financial asset for the person and, in either case, accepts it for credit to the person's securities account; or

• becomes obligated under other law, regulation, or rule to credit a financial asset to the person's securities account.

13 Pa. C.S. A. §8501(b).

15

a  "securities account:"

> an account to which a ***financial asset*** is or may be credited in accordance with an agreement under which the person maintaining the account undertakes to treat the person for whom the account is maintained as entitled to exercise the rights that comprise the financial asset.

13 Pa. C.S.A. §8501 (emphasis added).

A "financial asset" is defined in relevant part as

> (1) a security; or . . . (3) ***any property that is held by a security intermediary*** for another person in a securities account if the securities intermediary has expressly agreed with the other person that the property is to be treated as a financial asset under this division. . . .

13 Pa. C.S.A. §8102 (emphasis added).[15]

And, finally, a "securities intermediary" is either a (1) clearing corporation; or (2) a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity. 13 Pa. C.S.A. §8102(a).

## 2.

The Bank contends that the Parent Account was investment property because it was a "securities account."  The Trustee takes the position that the Parent Account was a deposit account.  I agree with the Bank.

Prior to June 10, 2011, the Parent Account consisted of shares of stock in various companies.  Under 13 Pa. C.S. § 8102(a), the stock interests were "securities" and "financial

---

[15]    As further explained in Comment 1 to §8501, "[w]hether an arrangement . . . concerning a security or other financial asset is a 'securities account' . . . depends on whether the firm has undertaken to treat the other person as entitled to exercise the rights that comprise the security or other financial asset. . . ."

assets" and Schwab clearly was a "securities intermediary."  Because these were being

maintained by Schwab, a securities intermediary, it follows that the Parent Account was a

"securities account" under 13 Pa. C.S.A. §8501.  As a "securities account," the Parent Account

constituted "investment property" under 13 Pa. C.S.A. §9102.[16]  Investment property and deposit

accounts being mutually exclusive, the Parent Account could not have been a deposit account.

See 13 Pa. C.S.A. §9102 ("The term [deposit account] does not include investment property or

accounts evidenced by an instrument.").[17]

**3.**

For much the same reasons, I conclude easily that the three (3) Sub-Accounts also

constitute investment property.

According to the June 16th Letter, D'Antonio (the Bank's representative) authorized

Schwab to allocate funds from the Parent Account to the Sub-Accounts and to invest in certain

---

[16]     I find further support for my conclusion from the fact that the Bank entered into a
"**Securities** Account Pledge Agreement," which specifically references the Parent Account as a
"Securities Account."

[17]     At some point in time, the stock must have been sold because, as of June 10, 2011, the
Parent Account held only a Money Market Fund with a value of $1,004,833.75.  (See Ex. Bank-27).
However, the fact that the stock was sold and the receipts held in the Parent Account in the form of a
money market fund does not alter the Parent Account's status as investment property.  All property held
by a "securities intermediary" (such as Schwab, in this case) is a "financial asset" if the securities
intermediary has expressly agreed with the investor that the property should be treated as such.  13 Pa.
C.S. A. §8102(a)(9)(iii).  As a financial asset being maintained in a securities account, the money market
fund was a securities entitlement and therefore, investment property.  See 13 Pa. C.S.A. §9102.  Further,
as comment 4 to 13 Pa. C.S. A. §9108 states:

> [G]iven the broad definition of "securities account" in Section 8-501, a security
> interest in a securities account also includes all other rights of the debtor against
> the securities intermediary arising out of the securities account. For example, a
> security interest in a securities account would include credit balances due to the
> debtor from the securities intermediary, whether or not they are proceeds of a
> security entitlement.

funds: Account 7344 to Endowment Mutual Fund 20/80; Account 4162 into "Tactical Fixed Income" fund; and 4488 in "Sage Advisory Multi Asset Income fund.". (Ex. Bank-16). Certain transfers took place on June 22, 2011, and as of July 1, 2011, the Parent Account was reduced to a value of $1,519.87. (Ex. Bank-20).[18] All but $32.72 of that remaining value was transferred to each of the Sub-Accounts ten (10) days later, on July 1, 2011.[19] (Id.). And, in reviewing the July 1-31, 2011 statements provided for each of the three (3) Sub-Accounts, one can see that each account consisted of some securities.[20]

The Trustee suggests that the existence of some cash in the Sub-Accounts somehow transforms the account from "investment property" into "deposit accounts," and that, because there was no control agreement for the specific Sub-Accounts, the Bank's lien became unperfected. The Trustee offers no legal authority in support for the premise of the argument, i.e., the novel proposition that the existence of some cash in a securities account maintained by a

---

[18]     $402,140.76 was "journaled" to Account 4162; $402,140.76 was "journaled" to Account 7344; and $201,070.38 was "journaled" to Account 4438.

[19]     $303.97 was "journaled" to Account 4438; $607.95 was "journaled" to Account 7344; and $607.95 was "journaled" to Account 4162. (Ex. Bank-20).

[20]     According to Statement Period July 1-31, 2011:

- Account 7344 held $321,903.63 in Bond Funds; $52,446.05 in Equity Funds; $12,505.58 in "Other Assets" and $20,065.86 in Cash. (Ex. Bank-21).

- Account 4162 held $348,148.27 in Bond Funds; $38,983.73 in Equity Funds; and $16,082.93 in Cash. (Ex. Bank-22).

- Account 4438 held $198,195.08 in "Other Assets;" and $3,835.14 in Cash. (Ex. Bank-23). The statement for this account was not complete, but from the documents provided one can see that the account received dividends and interest from shares in the S&P PFD FUND: PFF; as well as other specified bonds.

securities intermediary turns the account into a deposit account.  To the contrary, while each of

the Sub-Accounts held some cash, they remained with Schwab, a securities intermediary, and

also held securities, in large part.  Accordingly, the Sub-Accounts continued to hold "financial

assets," continued to be maintained by a "securities intermediary" and continued to be "securities

accounts," and therefore, "investment property."

 The status of the Sub-Accounts as investment property having been determined, I can

now address the ultimate issue: whether the Bank's lien was perfected.


### E.  Perfection of the Parent Account: Pennsylvania UCC Provisions

 According to §9301(a) of the Pennsylvania UCC, the general rule is that the local law of

the jurisdiction in which the debtor is located "governs perfection, the effect of perfection or

non-perfection and the priority of a security interest in collateral."  There are exceptions,

however.  See 13 Pa. C.S. § 9301(e).  One exception is for investment property.  Id. §9301(e)(3).

The rules governing perfection of security interests in investment property are set forth in 13 Pa.

C.S.A. §9305.

 Section 9305(a)(1)-(4) states the general rules governing perfection of a security interest

in a certificated security, an uncertificated security, a security entitlement, a securities account or

a commodity contract or commodity account.  However, Section 9305(a) expressly states that its

rules apply "except as otherwise provided in subsection (c)."  Subsection (c) addresses the

perfection of a security interest in investment property by filing.  Thus, for present purposes,

§9305(c) is the controlling provision.

 Section 9305(c) provides, in relevant part, that the law of the jurisdiction in which **the**

Case 13-00199-elf    Doc 58-2    Filed 06/12/14    Entered 06/12/14 11:54:07    Desc Main
Document    Page 20 of 24

**debtor is located** governs perfection of a security interest by filing. Here, the Bank filed a financing statement, so I must determine the location of the Debtor to determine which jurisdiction's law of perfection is applicable.[21]

The "location of the debtor" depends upon whether the debtor is an individual, has only one place of business, or has more than one place of business. See 13 Pa. C.S.A. §9307(b). However, yet again, there is an exception to the general rule. A different rule applies if the organization is a "registered organization" under the law of a state. A "registered organization" is defined in Section 9-102, in relevant part as an "organization formed or organized solely under the law of a single state or the United States by the filing of a public organic record, with the issuance of a public organic record by or the enactment of legislation by the state or the United States." A registered organization is "located" in the state of its organization. 13 Pa. C.S.A. §9307(e).

In this case, Delaware law governs the issue of perfection because the Debtor is a registered corporation in Delaware (though physically located in Pennsylvania).

---

[21]    The Trustee argues, by way of the Delaware UCC's parallel provision, 6 Del. C. §9-305, that California law governs perfection of the Bank's lien on the Schwab accounts. Although I have already concluded that the Pennsylvania UCC governs, I am mindful that 6 Del. C. §9-305 is identical to Pennsylvania's provision. The Trustee's argument is grounded in subsection (a) of §9305. Specifically, §9305(a)(3) under the Pennsylvania UCC provides that the "local law of the securities intermediary's jurisdiction," as specified in 13 Pa. C.S.A. §8110(e), governs perfection. Section 8110(e)(1), (2) provides that the agreement between the securities intermediary (here, Schwab) and the entitlement holder (here, the Debtor) may specify the securities intermediary's jurisdiction. Because the Control Agreement between Schwab and the Debtor (Ex. Bank-14) is governed by California law, the Trustee contends that California is the securities intermediary's jurisdiction under §8110(e)(1), (2) and therefore, California law governs perfection pursuant to 13 Pa. C.S. A. §9305(a)(3).

This argument fails because §9305(a) is not applicable. Section 9305(c) controls.

### F.  Perfection of the Parent Account: Application of the Delaware UCC

The next issue is whether the Parent Account (investment property) was properly

perfected under Delaware law by the filing of a financing statement.[22]

Through 6 Del C. §9-502, Delaware has adopted the system of "notice filing," which

means that "only a simple record providing a limited amount of information (financing

statement)" is required.  6 Del. C. §9-502, Cmt. 2.  "The financing statement may be filed before

the security interest attaches or thereafter."  Id.  The contents of the financing statement are

sufficient if it:

> (1) provides the name of the debtor;
>
> (2) provides the name of the secured party; and
>
> (3) indicates the collateral covered by the financing statement.

6 Del C. §9-502(a)(1)-(3).

There are no disputed issues regarding the first two (2) requirements.

As for the indication of collateral, a financing statement is sufficient if it provides either:

(1) a description of the collateral pursuant to §9-108; or (2) an indication that the financing

statement covers all assets or all personal property.  6 Del. C. §9-504.  A description of

---

[22]    There is no question that, separate and apart from the filing of the financing statement, the Control Agreement also perfected the Parent Account.  See 6 Del. C. §§9-106, 9-314.  The Trustee concedes this point.  However, there was no control agreement governing the Sub-Accounts.  Thus, the continued perfection of the Bank's lien is dependent on the continuing efficacy of the perfection by filing a financing statement.

I also note that I am aware that it is common for a secured creditor to employ multiple perfection methods.  One reason for this is that although investment property may be perfected by filing, if a subsequent secured creditor perfects a lien on investment property by control, the subsequent secured party has lien priority over the earlier lien that was perfected by filing only (without control).  See 6 Del. C. §9-328.  Nothing in the record suggests that occurred here.

investment property collateral is sufficient if the financing statements describes the collateral "as investment property."  Id. §9-108(d); see also id., cmt. 4 ("describing collateral as a securities account is a simple way of describing all of the security entitlements carried in the account").

Here, there were two (2) financing statements (Exs. Bank-9 & 10), filed for two (2) different loans from the Bank, both of which define the collateral to include: "[a]ll . . . investment property . . . all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property." This description suffices under §9-108.[23]  Therefore, I conclude that the Parent Account was perfected by the filing of the Financing Statement.

### G.  Perfection of the Sub-Accounts

I also conclude that the Sub-Accounts were perfected by the Financing Statement.

The Sub-Accounts are all securities accounts held by Schwab, a securities intermediary and, as explained above, are "investment property" under the UCC.[24]  Therefore, given that the Financing Statement identified the collateral securing the loan as "all investment property," one may draw the conclusion that the Sub-Accounts are covered by the Financing Statement.

---

[23]    I am not concerned that the collateral schedules were inadvertently switched because the error is not "seriously misleading."  See supra. note 5; 6 Del. C. §9-506(a) ("A financing statement substantially satisfying the requirements of this part is effective, even if it has minor errors or omissions, unless the errors or omissions make the financing statement seriously misleading.").  In fact, the operative language at issue here was identical in both collateral schedules.

[24]    Contrary to the Trustee's position, it was not necessary that the Bank obtain new control agreements for each Sub-Account.  Perhaps it might have been more prudent due to the potential loss of lien priority to a subsequent creditor obtaining control of the securities account, see supra note 21, but it is not the only method for perfection of investment property.

The Sub-Accounts also may be characterized as "after-acquired" collateral.[25]  See

generally 6 Del. C. §9-204  ("Except as otherwise provided in subsection (b), a security

agreement may create or provide for a security interest in after-acquired collateral.").[26]

The Loan Agreement defined "collateral" as "personal property, . . . whether now owned

or hereafter acquired, created and arising and wherever located. . . . ."  (Ex. Bank-12, at ¶3.1.a.).

Furthermore, the Financing Statements defined the collateral as including "investment property

. . . whether now existing or hereafter arising, whether now owned or hereafter acquired or

whether now or hereafter subject to any rights in the foregoing property."  The Sub-Accounts,

created after the Financing Statement, were perfected by the Financing Statement by virtue of

being after-acquired securities accounts.  See also 6 Del. C. §9-502, cmt. 2.[27]

---

[25]      Alternatively, the Bank argued that the Sub-Accounts were "proceeds" of the Parent
Account and were automatically perfected.  See 6 Del. C. §315(a)(2), (c).  Because I resolve the Bank's
Motion on other grounds, I do not reach this issue.

[26]      6 Del. C. §9-204 provides for after-acquired property in security agreements.  According
to Comment 2:

> Subsection (a) makes clear that a security interest arising by virtue of an
> after-acquired property clause is no less valid than a security interest in collateral
> in which the debtor has rights at the time value is given. A security interest in
> after-acquired property is not merely an "equitable" interest; no further action by
> the secured party-such as a supplemental agreement covering the new collateral
> is required. This section adopts the principle of a "continuing general lien" or
> "floating lien." It validates a security interest in the debtor's existing and (upon
> acquisition) future assets, even though the debtor has liberty to use or dispose of
> collateral without being required to account for proceeds or substitute new
> collateral. . . .

[27]      §9-502, Cmt. 2 states:

> [A] financing statement is effective to cover after-acquired property of the type
> indicated and to perfect with respect to future advances under security
> agreements, regardless of whether after-acquired property or future advances are
>                                                                    (continued...)

## VI.  CONCLUSION

Based on the undisputed facts and, as a matter of law, the Bank's interest in the Schwab accounts remained perfected following the transfers made from the Parent Account to the Sub-Accounts.  Accordingly, the Bank is entitled to summary judgment because the Trustee cannot prevail on his claims that the Bank's lien is avoidable as an unperfected lien.

An appropriate Order follows.

Date: **June 12, 2014**

_____
**ERIC L. FRANK**
**CHIEF U.S. BANKRUPTCY JUDGE**

---

[27](...continued)

mentioned in the financing statement and even if not in the contemplation of the parties at the time the financing statement was authorized to be filed.